GEORGE L. RICKARD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 15606. Promulgated February 11, 1929.

*Lawrence P. Mattingly, Esq.*, for the petitioner.
*Eugene Meacham, Esq.*, and *Charles E. Lowery, Esq.*, for the respondent.

OPINION.

VAN FOSSAN : The petitioner in this proceeding, George L. Rickard, popularly known as "Tex" Rickard (now deceased), was a professional promoter whose enterprise lead him from the gold fields of Alaska and Nevada to the cattle ranches of South America and thence to the City of New York, where he was manager of Madison Square Garden. The range of his activities as pertinently shown by the record in this case extended from the operation of a saloon and dance hall in Rawhide, Nev., to the promotion of world championship prize fights. From this latter activity arose the first ground of error alleged in the petition.

During the taxable year 1921 Rickard promoted the Dempsey-Carpentier prize fight. In this enterprise he had as a "silent partner" John Ringling, with whom he agreed to share equally the profits of the enterprise. Motion pictures had been taken of the fight and distribution thereof was made through various persons. The net profits received by Rickard for his (and Ringling's) share in the pictures were $40,900, of which sum Rickard paid Ringling one-

half. The interstate transportation of the fight pictures being in violation of law, indictments were returned against Rickard and others in several jurisdictions. Rickard kept no personal books, but believing that he would be obliged to incur legal expenses and possibly be required to pay fines as a result of the indictments which would equal the amount in his hands as profits of the motion picture venture, he did not return as income for 1921 the profits so received. Respondents added said sum to income and determined a deficiency of $5,911.47, to which was added a fraud penalty of 50 per cent.

Rickard's belief that he would be called on to pay lawyer's fees and fines constituted no valid reason for failure to report as income the profits so received. The expenditure had not been incurred and even if already expended such items would not have been deductible expenses. *Columbus Bread Co.*, 4 B. T. A. 1126. Nor would the illegal aspect of the enterprise make the profits thereof tax exempt. *United States* v. *Sullivan*, 274 U. S. 259. The respondent, therefore, correctly held that such profits were taxable. The amount so received by Rickard was $20,450.

We do not agree, however, with respondent's finding that Rickard was guilty of fraud with intent to evade tax. Since this case was heard after the Revenue Act of 1928 became effective, the burden of establishing fraud was on respondent. To establish fraud the production of clear and convincing evidence is necessary. The evidence fails to sustain the charge. Rickard acted ignorantly but without intent to defraud. Likewise, the evidence does not establish that Rickard acted negligently or with intentional disregard of rules and regulations. The fraud penalty is disapproved.

The above disposes of the questions raised by the petition in the case. There were, however, a number of additional items placed in issue by affirmative averments of respondent in his answer as amended. They deal with items of deductions previously allowed by respondent, now claimed to have been allowed in error. As to all of these the burden of proof is on respondent. Such being the case his proof must be measured by the same yardstick as is applied to petitioner's evidence when he has the burden of proof.

In October, 1918, Rickard acquired 997 shares out of a total of 4,000 shares of Frigorifico San Salvador del Paraguay, a corporation engaged in meat packing in South America. During 1918 the corporation prospered. But in the spring of 1919 the bottom dropped out of the market and the company was caught with large stocks which were unsalable. The corporation immediately began to liquidate and in his tax return for the year 1919 petitioner claimed a loss of $75,000 on his investment valued at $200,000. This loss was disallowed by respondent and petitioner was required to pay an addi-

tional tax of $42,000. In 1921 petitioner claimed and was allowed a further loss of $125,000 on account of this investment. Respondent now alleges the allowance to have been erroneous and in his brief claims the entire loss was suffered in 1919. The only evidence directly bearing on the precise point is Rickard's admission that he knew in 1919 that they " were sunk." We do not deem this admission enough to establish respondent's contention that the entire loss was sustained in that year. Petitioner evidenced his belief in the amount of loss sustained in 1919 by claiming a deduction of $75,000. He deemed the investment to have been proven a total loss and fully established when he filed his return for 1921. Passing without comment the practical injustice that would be done the petitioner by sustaining respondent's position that the entire loss was suffered in 1919, in spite of respondent's previous disallowance of a partial loss for that year, and petitioner's payment of additional taxes on account thereof, it is sufficient to state that in our opinion respondent has failed to prove that his original action in allowing the deduction for 1921 was in error.

As to the deduction of $14,407.50 on account of the investment in 1906 in United Ely Copper Co., we believe the record amply shows that this stock was worthless long before the taxable year 1921. There were no sales of the stock after 1907. No mining was done after 1909. Except for assessment work performed in order to maintain title the property lay idle for all the following years. Rickard held to this stock in the faint hope that some day it might prove valuable. The fact of a loss, however, is not to be determined solely by an attitude of mind. The ascertainment of worthlessness of property or investment is a practical matter to be gauged by practical business standards. The illusory hope of a speculator or a professional promoter that his investments, proven unprofitable for years past, may some day prove valuable is not sufficient basis to postpone from year to year the cold fact of actual worthlessness already reasonably established. Nor does the fact that in furtherance of such hope he may "send good money after bad " and spends small sums periodically to keep the investment legally alive stay the operation of those economic laws which have brought about practical worthlessness. The respondent is sustained as to this item.

Similar observations apply to the investment in 1908 in stock of the Bovard Strike Gold Mining Co., as to which a deduction of $7,400 was allowed. This mine was successful for a short time after 1908 but the ore "spaced out." Rickard held his stock until his tax advisor sold it at auction in 1921 to establish a loss for income-tax purposes. We are convinced that the stock became practically worthless years before and accordingly disallow the deduction.

In Northern Rawhide Incorporated the legal phases are the same, the type of activity only being changed. This was an investment made in 1908 in a saloon and gambling property in Rawhide, Nev., on which Rickard claimed a loss of $1,000 in 1921. The evidence is that the original investment of $15,000 was made during the boom time of the mining town of Rawhide. With the passing of the gold rush the town dwindled to a few inhabitants. Rickard himself was never there after 1910 and did not consider the stock as worth much after 1915. We believe it became worthless long prior to the year 1921 and accordingly disallow the deduction.

The remaining items in the case reveal yet another side of the life of Rickard—that showing him to have been a man to whom appeals for financial help were seldom made in vain and with whom generosity with friends and associates amounted almost to a business fault.

In July, 1919, Rickard loaned W. A. Gavin $5,000, taking a check to cash to cover the same. The check was never paid and in 1921 Gavin went to Europe and has never been heard from since. A receiver was appointed for his interests but nothing was left for creditors. The deduction was properly allowed.

Louis H. Goldsoll borrowed $3,000 on a note dated July 15, 1919. Throughout 1920 and 1921 Rickard expected to obtain repayment and as evidence of his confidence loaned him an additional $1,500 in 1921. In the fall of 1921 Goldsoll committed suicide, leaving nothing. The deduction was proper.

Again, in 1919 Rickard "loaned" Kenneth Donellson $100 to enable him to get back to Nevada. The evidence indicated no reasonable expectation that the sum would ever be repaid when made and the deduction of this item is accordingly disallowed.

A. D. Meyers borrowed $500 on a note of March 1, 1919, and $620 in July of the same year. As to him Rickard testified he was a "money maker" and the discoverer of Goldfield, Nev. Rickard fully expected repayment. Meyers went west and in 1921 his address was unknown. The allowance will stand.

O. C. Nelson was "loaned" $50 in April, 1919. Since Rickard frankly admitted on the stand he did not expect to be repaid at the time he made the loan this item is disallowed.

As to $90 loaned to Thomas Kelly the witness had no recollection. Respondent having failed to prove the previous allowance to have been improper the same will stand.

A similar ruling is made as to $100 loaned to Battling Nelson. Though Rickard stated that through family adjustments he now expected to get this money back, the record fails to establish that in 1921 it was not a bad debt. The allowance will stand.

Respondent introduced no evidence as to the loan to R. G. Ward amounting to $180. The allowance accordingly will not be disturbed.

In August, 1921, Rickard loaned $25,000 to Trippe & Co., who went into receiver's hands in a few weeks and never paid anything to creditors. The allowance was correct.

The last item was $2,300 loaned in 1915 to William Dewey on a note which was renewed several times and on which some interest was paid. Dewey died in 1921 leaving no assets. The allowance will stand.

*Judgment will be entered under Rule 50.*